## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

| | | |
|---|---|---|
| **PROFESSOR TODD ZYWICKI,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | CIVIL ACTION NO._____ |
| **GREGORY WASHINGTON,** | ) | |
| **in his official capacity as President of** | ) | COMPLAINT FOR DECLARATORY |
| **George Mason University; JAMES W.** | ) | JUDGMENT AND INJUNCTIVE |
| **HAZEL, in his official capacity as Rector** | ) | RELIEF |
| **of the Board of Visitors;** | ) | |
| **HORACE BLACKMAN, in his official** | ) | JURY TRIAL DEMANDED |
| **capacity as Vice Rector of the Board of** | ) | |
| **Visitors; SIMMI BHULLER, in her** | ) | |
| **official capacity as Secretary of the** | ) | |
| **Board of Visitors; DAVID FARRIS, in** | ) | |
| **his official capacity as Executive Director,** | ) | |
| **Safety and Emergency Management;** | ) | |
| **JULIE ZOBEL, in her official capacity as** | ) | |
| **Assistant Vice President of Safety,** | ) | |
| **Emergency, and Enterprise Risk** | ) | |
| **Management; and ANJAN** | ) | |
| **CHIMALADINNE, JUAN CARLOS** | ) | |
| **ITURREGUI, MEHMOOD KAZMI,** | ) | |
| **WENDY MARQUEZ, IGNACIA S.** | ) | |
| **MORENO, CAROLYN MOSS,** | ) | |
| **DOLLY OBEROI, JON PETERSON,** | ) | |
| **NANCY GIBSON PROWITT, PAUL** | ) | |
| **J. REAGAN, EDWARD J. RICE,** | ) | |
| **DENISE TURNER ROTH, and BOB** | ) | |
| **WITECK, in their official capacities** | ) | |
| **as Members of the Board of Visitors,** | ) | |
| | ) | |
| *Defendants.* | ) | |

Plaintiff Todd Zywicki, by and through his attorneys at the New Civil Liberties Alliance, hereby complains and alleges the following:

## INTRODUCTORY STATEMENT

a.      By the spring of 2020, the novel coronavirus SARS-CoV-2, which can cause the disease COVID-19, had spread across the globe.  Since then, and because of the federal government's "Operation Warp Speed," three separate coronavirus vaccines have been developed and approved more swiftly than any other vaccine in our nation's history.  The Food and Drug Administration ("FDA") issued an Emergency Use Authorization ("EUA") for the Pfizer-BioNTech COVID-19 Vaccine ("Pfizer Vaccine") on December 11, 2020.[1]  Just one week later, FDA issued a second EUA for the Moderna COVID-19 Vaccine ("Moderna Vaccine").[2]  FDA issued its most recent EUA for the Johnson & Johnson COVID-19 Vaccine ("Janssen Vaccine") on February 27, 2021 (the only EUA for a single-shot vaccine).[3]

b.      The EUA statute, 21 U.S.C. § 360bbb-3, explicitly states that anyone to whom the product is administered must be informed of the option to accept or to refuse it, as well as the alternatives to the product and the risks and benefits of receiving it.

c.      On June 28, 2021, George Mason University ("GMU") announced a reopening policy (the "Policy") related to COVID-19 for the Fall 2021 semester.  The Policy requires all unvaccinated faculty and staff members, including those who can demonstrate natural immunity from a prior COVID-19 infection, to wear masks on campus, physically distance, and undergo

---

[1] *Pfizer-BioNtech Vaccine FAQ*, FDA, bit.ly/3i4Yb4e (last visited July 28, 2021).

[2] *Moderna, About Our Vaccine*, bit.ly/2Vl4lUF (last visited July 28, 2021).

[3] *EUA for Third COVID-19 Vaccine*, FDA, bit.ly/3xc4ebk (last visited July 28, 2021).

frequent COVID-19 testing.  Additionally, the Policy strips unvaccinated employees of their eligibility for future merit-based pay increases because they cannot upload proof of vaccination. On July 22, GMU emailed students and employees about the policy and threatened disciplinary action—including termination of employment—against those who do not comply.  This threat was reiterated on the university's website and in an August 2, 2021 email sent to Professor Zywicki.

d.     Professor Todd Zywicki has already contracted and fully recovered from COVID-19.  As a result, he has acquired robust natural immunity, confirmed unequivocally by multiple positive SARS-CoV-2 antibody tests conducted over the past year.  Professor Zywicki's immunologist, Dr. Hooman Noorchashm, has advised him that, based on his immunity status and personal medical history, it is *medically unnecessary* to undergo a vaccination procedure at this point (which fact also renders the procedure and any attendant risks medically unethical).

e.     Yet, if Professor Zywicki follows his doctor's advice and elects not to take the vaccine, that will diminish his efficacy in performing his professional responsibilities by hamstringing him in various ways, such as requiring him to wear a mask that has no public health value given his naturally acquired immunity.  He will also face adverse disciplinary consequences. In short, the Policy is unmistakably coercive and cannot reasonably be considered anything other than an unlawful mandate. And even if the Policy is not deemed coercive, it still represents an unconstitutional condition being applied to Professor Zywicki's constitutional rights to bodily integrity and informed medical choice, respectively.

f.     Given the antibodies generated by his naturally acquired immunity, the Commonwealth of Virginia cannot claim a compelling governmental interest in overriding Professor Zywicki's personal autonomy and constitutional rights by forcing him, in essence, to either be vaccinated or to suffer adverse professional consequences.  Natural immunity is at least

as robust and durable as that attained through the most effective vaccines, and is significantly more protective than some of the inferior vaccines that GMU accepts.  Very recent studies are also establishing that natural immunity is significantly longer lasting. As a result, GMU's Policy is designed to force its way past informed consent and infringes upon Professor Zywicki's rights under the Ninth and Fourteenth Amendments to the United States Constitution.

g.      For similar reasons, the Policy constitutes an unconstitutional condition, because it is poorly calibrated to protect the public health, yet it poses disproportionate risks on some of its targets. That renders the Policy an unlawful condition insufficiently germane to its purported purpose.  Furthermore, the disciplinary and other burdens that GMU is using to leverage ostensibly voluntary compliance with its Policy are not proportional to the purported public health aims.

h.      Even beyond its constitutional defects, GMU's unlawful Policy is irreconcilable with and frustrates the objectives of the statute governing administration of medical products authorized for emergency use only.  Pursuant to the Supremacy Clause of the United States Constitution, federal law overrides conflicting state law and action by agents of the Commonwealth.  Accordingly, the Policy is preempted by the EUA statute and must be enjoined.

i.      In a highly publicized opinion recently made public, the U.S. Department of Justice's Office of Legal Counsel ("OLC") argues that public and private entities can lawfully mandate that their employees receive one of the vaccines.[4]  The opinion is silent on preemption, however, and thus cannot be read to prevent the EUA statute from having its ordinary preemptive effect, and this is especially true where OLC was assigned no role by Congress to administer the EUA statute.  The OLC Opinion, as explained in detail in Count III below, is also deeply flawed on multiple additional legal grounds.

---

[4] CNN story, https://cnn.it/3iWxH42, last visited (July 29, 2021).

j.      In sum, the Policy violates *both* Professor Zywicki's constitutional *and* federal statutory rights because it undermines his bodily integrity and conditions his ability to perform his job effectively on his willingness to take a vaccine that his doctor has advised could harm him. And forcing him to take this vaccine will provide no discernible, let alone compelling, benefit either to Professor Zywicki or to the GMU community.  The unconstitutional conditions doctrine exists precisely to prevent government actors from clothing unconstitutional objectives and policies in the garb of supposed voluntarism when those actors fully intend and expect that the pressure they are exerting will lead to the targets of such disguised regulation succumbing to the government's will.  Professor Zywicki invokes this Court's Article III and inherent powers to insulate him from this pressure and to vindicate his constitutional and statutory rights.

## PARTIES

1.      Plaintiff Todd Zywicki (55 years old) is a GMU Foundation Professor of Law at the Antonin Scalia Law School, located in Arlington, Virginia.  He resides in Falls Church, Virginia.

2.      Defendant Gregory Washington is President of GMU, an administrative unit of the Commonwealth of Virginia located in Fairfax, Virginia.  He is sued in his official capacity.

3.      Defendant James W. Hazel is Rector of the Board of Visitors at GMU.  He is sued in his official capacity.

4.      Defendant Horace Blackman is Vice Rector of the Board of Visitors at GMU.  He is sued in his official capacity.

5.      Defendant Simmi Bhuller is Secretary of the Board of Visitors at GMU.  She is sued in her official capacity.

6.      Defendant David Farris is GMU's Executive Director of Safety and Emergency Management.  He is sued in his official capacity.

7.      Defendant Julie Zobel is GMU's Assistant Vice President of Safety, Emergency, and Enterprise Risk Management.  She is sued in her official capacity.

8.      Defendants Anjan Chimaladinne, Juan Carlos Iturregui, Mehmood Kazmi, Wendy Marquez, Ignacia S. Moreno, Carolyn Moss, Dolly Oberoi, Jon Peterson, Nancy Gibson Prowitt, Paul J. Reagan, Edward J. Rice, Denise Turner Roth, and Bob Witeck compromise the remainder of the Board of Visitors.  They are sued in their official capacity.

## STATUTORY AND NONSTATUTORY JURISDICTION AND VENUE

9.      This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3)-(4) (equitable relief), and 42 U.S.C. §§ 1983 and 1988, as well as under nonstatutory equitable jurisdiction.  That is because the claims here arise under the Constitution and statutes of the United States and because Professor Zywicki seeks prospective redress against state actors in their official capacity to end the deprivation, under state law, of his rights, privileges, and immunities secured by federal law.

10.      Venue for this action properly lies in this District pursuant to 28 U.S.C. § 1391 because Professor Zywicki resides in this judicial district and a substantial part of the events, actions, or omissions giving rise to the claim occurred in this judicial district, where GMU is principally located.

11.      This Court's equitable powers permit it to issue nonstatutory injunctions to protect Professor Zywicki against wayward state actors engaged in unlawful conduct.  *See Trump v. Vance*, 140 S. Ct. 2412, 2428-29 (2020) ("*Ex parte Young*, 209 U.S. 123, 155–156 (1908) (holding

that federal courts may enjoin state officials to conform their conduct to federal law).").[5]  The only limitation is that a defendant subject to such an injunction must possess a connection to the establishment and enforcement of GMU's vaccine mandate.  Each of the defendants in this action have the requisite connection.  *See, e.g., Bostic v. Schaefer*, 760 F.3d 352, 371 n.3 (4th Cir. 2014) (Virginia's Registrar of Vital Records could be sued under *Ex parte Young* for unconstitutional actions related to marriage rights because he was charged with ensuring compliance with the Commonwealth's marriage laws).  Defendants, respectively, run GMU, administer it, or as to some defendants, personally participated in formulating and issuing the Policy challenged here.  *See generally Free Enter. Fund v. PCAOB*, 561 U.S. 477, 491 n.2 (2010) (collecting cases in the vein of *Bell v. Hood*, 327 U.S. 678, 684 (1946) ("[I]t is established practice for this Court to sustain the *jurisdiction* of federal courts to issue injunctions to protect rights safeguarded by the Constitution") (emphasis added)).

12.    This Court may also issue declaratory relief pursuant to 28 U.S.C. § 2201.  Additionally, "[f]urther necessary or proper relief based on a declaratory judgment may [also] be granted …," including via injunction.  *See Powell v. McCormack*, 395 U.S. 486, 499 (1969) ("A declaratory judgment can then be used as a predicate to further relief, including an injunction. 28 U.S.C. § 2202 ….").

---

[5] *See* Erwin Chemerinsky, FEDERAL JURISDICTION, 8th ed. (2021) (*Ex parte Young* "has been heralded as 'one of the three most important decisions the Supreme Court of the United States has ever handed down.'"), *quoting Allied Artists Pictures Corp. v. Rhodes*, 473 F. Supp. 560, 564 (E.D. Ohio 1979) (citations omitted).

## STATEMENT OF FACTS

I. **BACKGROUND PERTAINING TO THE CORONAVIRUS PANDEMIC AND COVID-19 VACCINES**

13.     The novel coronavirus SARS-CoV-2, which can cause the disease COVID-19, is a contagious virus spread mainly through person-to-person contact, including through the air.

14.     It is well-settled that the coronavirus presents a significant risk primarily to individuals aged 70 or older and those with comorbities such as obesity and diabetes. Bhattacharya and Kulldorff Joint Decl. ¶¶ 10-14 ("Joint Decl.") (Attachment A).  *See* Smiriti Mallapaty, *The Coronavirus Is Most Deadly If You Are Older and Male*, NATURE (Aug. 28, 2020) (individuals under 50 face a negligible threat of a severe medical outcome from a coronavirus infection, akin to the types of risk that most people take in everyday life, such as driving a car).

15.     In fact, a meta-analysis published by the World Health Organization ("WHO") concluded that the survival rate for COVID-19 patients under 70 years of age was 99.95%.  Joint Decl. ¶ 12.

16.     CDC estimates that the survival rate for young adults between 20 and 49 is 99.95% and for people ages 50-64 is 99.4%.   Joint Decl. ¶ 13.

17.     A seroprevalence study of COVID-19 in Geneva, Switzerland, reached a similar conclusion, estimating a survival rate of approximately 99.4% for patients between 50 and 64 years old, and 99.95% for patients between 20 and 49.  Joint Decl. ¶ 14.

18.     To date, FDA has approved three vaccines pursuant to the federal EUA statute, 21 U.S.C. § 360bbb-3.

a.     FDA issued an EUA for the Pfizer Vaccine on December 11, 2020.

b.     Just one week later, FDA issued an EUA for the Moderna Vaccine.

c.     FDA issued its most recent EUA, for the Janssen Vaccine, on February 27, 2021.

19.     The vaccines' EUA status means that FDA has not yet approved the vaccines, but FDA permits their conditional use nevertheless due to exigent circumstances.  *See* 21 U.S.C. § 360bbb-3.

20.     The standard for EUA approval is lower than that required for full FDA approval.

21.     Typically, vaccine development includes six stages: (1) exploratory; (2) preclinical (animal testing); (3) clinical (human trials); (4) regulatory review and approval; (5) manufacturing; and (6) quality control.  *See Vaccine Testing and the Approval Process*, CDC (May 1, 2014), *available at* https://bit.ly/3rGkG2s (last visited July 28, 2021).

22.     The third phase typically takes place over years, because it can take that long for a new vaccine's side effects to manifest.  *Id.*

23.     The third phase must be followed by a period of regulatory review and approval, during which data and outcomes are peer-reviewed and evaluated by FDA.  *Id.*

24.     Finally, to achieve full approval, the manufacturer must demonstrate that it can produce the vaccine under conditions that assure adequate quality control.

25.      FDA must then determine, based on "substantial evidence," that the medical product is effective and that the benefits outweigh its risks when used according to the product's approved labeling.  *See Understanding the Regulatory Terminology of Potential Preventions and Treatments for COVID-19*, CDC (Oct. 22, 2020), *available at* bit.ly/3x4vN6s (last visited July 28, 2021).

26.     In contrast to this rigorous, six-step approval process that includes long-term data review, FDA grants EUAs in emergencies to "facilitate the availability and use of medical countermeasures, including vaccines, during public health emergencies, such as the current

COVID-19 pandemic." *Emergency Use Authorization for Vaccines Explained*, FDA (Nov. 20, 2020), *available at* bit.ly/3x8wImn (last visited July 28, 2021).

27.     EUAs allow FDA to make a product available to the public based on the best available data, without waiting for all the evidence needed for FDA approval or clearance. *See id.*

28.     The EUA statute states that individuals to whom the product is administered must be informed: (1) that the Secretary has authorized emergency use of the product; (2) of the significant known and potential benefits and risks of such use, and the extent to which such benefits and risks are unknown; and (3) of the option to accept or refuse administration of the product, of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks.  21 U.S.C. § 360bbb-3(e)(1)(A)(ii).

29.     Studies of immunizations outside of clinical-trial settings began in December 2020, following the first EUA for a COVID vaccine.

30.     None of the three vaccines approved for emergency use in the United States has been tested in clinical trials for its safety and efficacy on individuals who have recovered from COVID-19.  Noorchashm Declaration ("Noorchashm Decl.") ¶ 30 (Attachment B).

31.     Indeed, trials conducted so far have *specifically excluded* survivors of previous COVID-19 infections.  Noorchashm Decl. ¶ 30.

32.     Recent research indicates that vaccination presents a heightened risk of adverse side effects—including serious ones—to those who have previously contracted and recovered from COVID-19.  Noorchashm Decl. ¶¶ 22-26; Joint Decl. ¶ 27.

33.     The heightened risk of adverse effects results from "preexisting immunity to SARS-Cov-2 [that] may trigger unexpectedly intense, albeit relatively rare, inflammatory and thrombotic

reactions in previously immunized and predisposed individuals." Angeli et al., *SARS-CoV-2 Vaccines: Lights and Shadows*, 88 EUR. J. INTERNAL MED. 1, 8 (2021).

## II. PRIOR INFECTION LEADS TO NATURALLY-ACQUIRED IMMUNITY TO COVID-19 AT LEAST AS ROBUST AS VACCINE-ACQUIRED IMMUNITY

34. Naturally acquired immunity developed after recovery from COVID-19 provides broad protection against severe disease from subsequent SARS-CoV-2 infection. Joint Decl. ¶ 15.

35. Multiple extensive, peer-reviewed studies comparing naturally acquired and vaccine acquired immunity have concluded overwhelmingly that the former provides equivalent or greater protection against severe infection than immunity generated by mRNA vaccines (Pfizer and Moderna). Joint Decl. ¶ 18.

36. These studies confirm the efficacy of natural immunity against reinfection of COVID-19 and show that almost all reinfections are less severe than first-time infections and almost never require hospitalization. Joint Decl. ¶ 19.

37. A CDC/IDSA clinician call on July 29, 2021, summarized the current state of the knowledge regarding the comparative efficacy of natural and vaccine immunity. The presentation reviewed three studies that directly compared the efficacy of prior infection versus mRNA vaccine treatment and concluded "the protective effect of prior infection was similar to 2 doses of a COVID-19 vaccine."

38. Given that there is currently more data on the durability of natural immunity than there is for vaccine immunity, researchers rely on the expected durability of natural immunity to predict that of vaccine immunity. Joint Decl. ¶ 22.

39. Indeed, natural and vaccine immunity utilize the same basic immunological mechanism—stimulating the immune system to generate an antibody response. Joint Decl. ¶ 16.

40.     The level of antibodies in the blood of those who have natural immunity was initially the benchmark in clinical trials for determining the efficacy of vaccines.  Joint Decl. ¶ 16.

41.     Studies have demonstrated prolonged immunity with respect to memory T- and B-cells, bone marrow plasma cells, spike-specific neutralizing antibodies, and IgG+ memory B-cells following a COVID-19 infection.  Joint Decl. ¶ 17; Dr. Harvey Risch, Yale School of Medicine, interview ("Risch interview"), *Laura Ingraham Discusses How Medical Experts Are Increasing Vaccine Hesitancy* (July 26, 2021), *available at* https://bit.ly/3zOL6Sx (last visited July 27, 2021).

42.     T-cells last "quite a while," but B-cells migrate to the bone marrow and last even longer.  Risch interview.

43.     New variants of COVID-19 resulting from the virus's mutation do not escape the natural immunity developed by prior infection from the original strain of the virus.  Joint Decl. ¶ 29.

44.      In fact, vaccine immunity only targets the spike-protein of the original Wuhan variant, whereas natural immunity recognizes the full complement of SARS-CoV-2 proteins and thus provides protection against a greater array of variants.  Noorchashm Decl.  ¶ 17.

45.     The Janssen Vaccine provides immunity protection of somewhere between 66% and 85%, far below that conferred by natural immunity.  Joint Decl. ¶ 16; Noorchashm Decl. ¶ 15.

46.     The Chinese Sinovac Vaccine has been approved by WHO, which itself determined that this vaccine prevented *symptomatic* disease in just 51% of those who received it. *See WHO validates Sinovac COVID-19 vaccine for emergency use and issues interim policy recommendations*, WHO.INT (June 1, 2021), *available at* bit.ly/3yitIW7 (last visited Aug. 1, 2021).

47.     Other clinical studies have found that the Sinovac Vaccine offers even lower levels of protection against infection, including a study of Brazilian healthcare workers

determining a mere 50.39% efficacy in preventing infection. *See* Elizabeth de Faria, et al., *Performance of vaccination with CoronaVac in a cohort of healthcare workers (HCW)—preliminary report*, MEDRXIV (April 15, 2021), *available at* https://www.medrxiv.org/content/10.1101/2021.04.12.21255308v1 (last visited Aug. 3, 2021).

48.    Real-world evidence also suggests that the Sinovac Vaccine provides only minimal protection against the Delta variant. *See* Alexander Smith, *China on 'high alert' as variant of Covid-19 spreads to 5 provinces*, NBCNEWS.COM (July 30, 2021), nbcnews.to/2VcK3NB (last visited Aug. 1, 2021); Chao Deng, *As Delta Variant Spreads, China Lacks Data on Its Covid-19 Vaccines*, WALL ST. J. (July 9, 2021), *available at* on.wsj.com/3rMjlXW (last visited Aug. 1, 2021); Matt D.T. Hitchings, et al., *Effectiveness of CoronaVac in the setting of high SARS-Cov-2 P.1 variant transmission in Brazil: A test-negative case-control study*, THE LANCET (July 25, 2021), *available at* bit.ly/3C6F41J (last visited Aug. 1, 2021).

49.    The Sinopharm Vaccine also is from China and is WHO-approved. Although its reported level of efficacy against symptomatic infection has been reported as fairly high (78%), real-world experience has generated severe doubts about the accuracy of that estimate. Because of the Sinopharm Vaccine's poor performance, several countries stopped using it. *See* Yaroslav Trofimov and Summer Said, Bahrain, *Facing a Covid Surge, Starts Giving Pfizer Boosters to Recipients of Chinese Vaccine*, WALL ST. J. (June 2, 2021), *available at* on.wsj.com/3ljM0lX (last visited Aug. 1, 2021).

50.    The COVISHIELD vaccine, manufactured by the Serum Institute of India and South Korea's SK Bioscience Co., Ltd., is also WHO-approved and thus recognized as adequate to satisfy GMU's Policy. The WHO itself reported a mere 70.42% efficacy against *symptomatic* COVID-19 infection, which fell to 62.10% in individuals who received two standard doses. *See*

*Recommendation on Emergency Use Listing on COVISHIELD submitted by SIIPL*, WHO (Feb. 26, 2021), *available at* bit.ly/3rNjnPo (last visited Aug. 1, 2021); *Recommendation for an Emergency Use Listing of AZD1222 Submitted by AstraZeneca AB and manufactured by SK Bioscience Co. Ltd*., WHO (Feb. 23, 2021), *available at* bit.ly/3yiQD3s (last visited Aug. 1, 2021). These vaccines have not been approved by the FDA for use in the United States.

51.     Recent Israeli data found that those who had received the Pfizer Vaccine were 6.72 times *more likely* to suffer a subsequent infection than those with naturally acquired immunity. David Rosenberg, *Natural Infection vs Vaccination: Which Gives More Protection*? ISRAELNATIONALNEWS.COM (Jul. 13, 2021), *available at* https://www.israelnationalnews.com/News/News.aspx/309762 (last visited Aug. 1, 2021).

52.     Israeli data also indicates that the protection Pfizer grants against infection is short-lived compared to natural immunity and degrades significantly faster. In fact, as of July 2021, vaccine recipients from January 2021 exhibited only 16% effectiveness against infection and 16% protection against symptomatic infection, increasing linearly until reaching a level of 75% for those vaccinated in April. *See* Nathan Jeffay, *Israeli, UK data offer mixed signals on vaccine's potency against delta strain*, THE TIMES OF ISRAEL (July 22, 2021), *available at* bit.ly/3xg3uCg (last visited Aug. 1, 2021).

53.     Those who received a second dose of the Pfizer Vaccine between January and April of this year were determined to have 39% protection against infection and 41% protection against symptomatic infection. This further suggests that the large number of breakthrough infections was the result of waning vaccine protection as opposed to the spread of the Delta variant. *See* Carl Zimmer, *Israeli Data Suggests Possible Waning Infection in Effectiveness of Pfizer Vaccine*, THE

NEW YORK TIMES (July 23, 2021); Kristen Monaco, *Pfizer Vax Efficacy Dips at 6 Months*, MEDPAGE TODAY (July 29, 2021), *available at* https://bit.ly/2VheBxw (last visited Aug. 1, 2021).

54.     Early data also suggests that naturally acquired immunity may provide greater protection against both the Delta and Gamma variants than vaccine-induced immunity. A recent analysis of an outbreak among a small group of mine workers in French Guiana found that 60% of fully vaccinated miners suffered breakthrough infections compared to *zero* among those with natural immunity. Nicolas Vignier, et al., *Breakthrough Infections of SARS-CoV-2 Gamma Variant in Fully Vaccinated Gold Miners, French Guiana, 2021*, 27(10) EMERG. INFECT. DIS. (Oct. 2021), *available at* bit.ly/2Vmjx43 (last visited Aug. 3, 2021).

55.     In this vein, a mere few days ago, the CDC reported that "new scientific data" indicated that vaccinated people who experienced breakthrough infections carried similar viral loads to the unvaccinated (but not naturally immune), leading the CDC to infer that vaccinated people transmit the virus at concerning levels. *See CDC reversal on indoor masking prompts experts to ask, "Where's the data?"*, WASHINGTON POST (July 28, 2021), *available at* wapo.st/2THpmIQ  (last visited July 30, 2021).

56.     Around three-quarters of cases in a Cape Cod outbreak occurred in vaccinated individuals, again demonstrating that the vaccines are inferior to natural immunity when it comes to preventing infection. *See* Molly Walker, *CDC Alarmed: 74% of Cases in Cape Cod Cluster Were Among the Vaxxed*, MEDPAGE TODAY (July 30, 2021), *available at* bit.ly/2V6X3UP (last visited July 30, 2021).

57.     Many experts believe that the solution to "breakthrough" cases (individuals who become infected after vaccination or reinfection) is treating patients with a therapeutic intervention—not mandating vaccines for everyone, which will not entirely solve the problem for

the reasons discussed above.  The availability and effectiveness of therapeutics thus bear on the validity of state actors' claims that a vaccine mandate is necessary to protect the public health.  *See* Risch interview.

58.    As Drs. Bhattacharya and Kulldorff have explained, there is no legitimate public-health rationale for GMU to require proof of vaccination to participate in activities that do not involve care for high-risk individuals:

> Since the successful vaccination campaign already protects the vulnerable population, the unvaccinated — especially recovered COVID patients – pose a vanishingly small threat to the vaccinated. They are protected by an effective vaccine that dramatically reduces the likelihood of hospitalization or death after infections to near zero and natural immunity, which provides benefits that are at least as strong[.]  At the same time, the requirement for . . . proof of vaccine undermines trust in public health because of its coercive nature. While vaccines are an excellent tool for protecting the vulnerable, COVID does not justify ignoring principles of good public health practice.

Joint Decl. ¶¶ 45-46.

### III.  COVID-19 VACCINES CAN CAUSE SIDE EFFECTS, INCLUDING SEVERE ADVERSE EFFECTS

59.    Though the COVID-19 vaccines appear to be relatively safe at a population level, like all medical interventions, they carry a risk of side effects.  Those include common, temporary reactions such as pain and swelling at the vaccination site, fatigue, headache, muscle pain, fever, and nausea.  More rarely, they can cause serious side effects that result in hospitalization or death. Joint Decl. ¶¶ 24-25.

60.    The vaccines could cause other side effects that remain unknown at this time given the preliminary, emergency stage of the vaccines' approval process.  Joint Decl.¶ 27.

61.     Put differently, as a matter of simple logic, one cannot be certain about the long-term effects of a vaccine that has existed only for approximately a year, and thus cannot have been studied over a substantial period of time.  *See* Joint Decl. ¶ 26.

### IV.   PROFESSOR ZYWICKI HAS ROBUST NATURALLY ACQUIRED IMMUNITY TO COVID-19

62.     Todd J. Zywicki is a GMU Foundation Professor of Law at the Antonin Scalia Law School.

63.     He has been employed at GMU since August 1998, except for occasional service as a visiting professor at other law schools (including Georgetown University Law Center, Vanderbilt University Law School, and Boston College Law School) as well as high-level service in the United States government.

64.     He is one of the law school's most frequently cited and influential scholars and has been an exemplary leader in service to GMU and the community.

65.     In early March 2020, Professor Zywicki fell ill with symptoms consistent with a COVID-19 infection, including chills, night sweats, fatigue, and mental fogginess.

66.     At that time, COVID-19 tests were scarce and required a doctor's prescription, so Professor Zywicki could not obtain one.

67.     Professor Zywicki has subsequently tested positive for SARS-CoV-2 antibodies on several occasions when donating blood at the American Red Cross.

68.     Professor Zywicki requested these tests because he had volunteered to teach in person beginning in the Fall 2020 semester and wanted to reassure students of his immunity status.

69.     He received an unbroken string of positive COVID-19 antibody tests on July 25, September 29, and December 16, 2020, and February 9 and May 25, 2021.

70.     On June 1, 2021, Professor Zywicki consulted with Dr. Hooman Noorchashm, an immunologist.

71.     Dr. Noorchashm prescribed Professor Zywicki a full COVID-19 serological screening, which LabCorp. conducted a few days later.  Noorchashm Decl. ¶ 7.

72.     Just as Dr. Noorchashm expected, the screening confirmed that Professor Zywicki had previously recovered from SARS-CoV-2 and had a positive IgG Spike Antibody assay and a positive SARS-CoV-2 Nucleocapsid result.  Noorchashm Decl. ¶ 7.

73.     Professor Zywicki's semiquantitative antibody reading measured 715.6 U/ml— approximately 900 times higher than the baseline level of <0.8 and comparable to that possessed by vaccinated persons who share his age and health profile.  Noorchashm Decl. ¶ 7.

74.     Drs. Noorchashm and Bhattacharya have no doubt that Professor Zywicki has natural immunity because of his antibody levels.  Noorchashm Decl. ¶ 7.  *See also* Joint Decl. ¶ 40.

75.     Professor Zywicki's antibodies and immune protection provide sufficient and durable protection against reinfection and transmission of COVID-19.  Noorchashm Decl. ¶ 7.

76.     Medical necessity is a fundamental tenet of medical ethics.  This principle requires that public health agents utilize "the least intrusive" means possible to achieve a given end, because every medical procedure carries some risk.  Noorchashm Decl. ¶ 10; *see also* Joint Decl. ¶ 39.

77.     Based on his analysis of Professor Zywicki's antibodies screening test and overall medical history, Dr. Noorchashm concluded that *it is not medically necessary* for Professor Zywicki to undergo a full-course vaccination procedure to protect himself or the community from infection.  Noorchashm Decl. ¶¶ 12-34.

78.     Dr. Noorchashm also determined that a full-course vaccination procedure would expose Professor Zywicki to a heightened risk of adverse side effects that would exceed any speculative benefit the vaccine could confer on someone already protected with antibodies. Noorchashm Decl. ¶¶ 12-34.

79.     Existing clinical reports and studies indicate that individuals with a prior infection and naturally acquired immunity face an *elevated* risk of adverse effects from the vaccine, compared to those who have never contracted COVID-19.  Noorchashm Decl. ¶¶ 21-28.

80.     This is consistent with understandings of immunology generally, which recognize that "vaccinating a person who is recently or concurrently infected [with any virus] can reactivate, or exacerbate, a harmful inflammatory response to the virus.  This is NOT a theoretical concern[.]" Noorchashm Decl. ¶ 28.

81.     Given these potential side effects, and the fact that Professor Zywicki possesses naturally acquired immunity that makes the vaccine medically unnecessary, Dr. Noorchashm concluded, in his expert medical opinion, that subjecting Professor Zywicki to a full vaccine course would pose a risk of undue harm and thereby violate a fundamental tenet of medical ethics. Noorchashm Decl. ¶¶ 19-30.

82.     Professor Zywicki has real, substantial, and legitimate concerns about taking the vaccines in light of his naturally acquired immunity and the potential for short- and long-term side effects from the vaccines themselves.

## V.   GMU's Imposition of a Blanket Vaccine Requirement as Part of Its Reopening Policy and Professor Zywicki's Exemption Request

83.     GMU is a public research university located in Fairfax (Fairfax County), Virginia, that offers a variety of undergraduate and graduate programs, including several courses of legal studies at the Antonin Scalia Law School (GMU's law school) in Arlington, Virginia.  *See* George Mason University, *Wikipedia*, *available at* https://bit.ly/2TFxqtC (last visited July 28, 2021).

84.     In 2019, the average age of the law student entering class averaged 25 years. George Mason University, *Profile of the Fall 2019 Entering Class*, *available at* bit.ly/3l6vGVF (last visited July 28, 2021).

85.     On June 28, 2021, GMU announced via email its "campus reopening and vaccine requirements" for the Fall 2021 term.  (Attachment C).

86.     Another email addressing the Policy was distributed on July 22, 2021, to both employees and students (Attachment D), and a similar statement posted on GMU's website (Attachment E).  *See* George Mason University, "COVID-19 Public Health and Safety Precautions – Immunization (July 30, 2021)*, available at* bit.ly/37irKJ6 (last visited Aug. 3, 2021).

87.     According to GMU's Policy, all employees are "strongly encouraged to get vaccinated, and required to share their vaccination status[.]"  (Attachment D).

88.     The Policy requires "[a]ll George Mason University employees … to submit proof of COVID-19 vaccination no later than August 1, 2021 or receive one dose of a World Health Organization (WHO) approved vaccine by August 15, 2021."  (Attachment D).

89.     Employees must "share vaccination status through Mason COVID Health Check and, if vaccinated, [their] documentation through the Health Service portal."  (Attachment D).

90.     Employees may seek a medical examination at their own cost, a religious exemption, or a 100%-remote-work exemption from their manager.  (Attachment D).

91.     Unvaccinated employees who do not obtain a work-from-home exemption must "wear masks while on campus, physically distance, and undergo frequent COVID-19 testing." (Attachment C).

92.     Under the Policy, disclosure of vaccination status is also "a prerequisite for eligibility for any merit pay increases."  (Attachment C).

93.     Employees who "fail to receive an exemption and do not disclose their status and receive the vaccine" face "disciplinary action" that includes "unpaid leave or possible loss of employment."  (Attachments D & E); *See* George Mason University, "COVID-19 Public Health and Safety Precautions – Immunization."

94.     GMU's Policy does not exempt faculty and staff with naturally-acquired immunity to COVID-19 acquired through recovery from prior infection.  (Attachments C, D, E & I).

95.     Based on personal information and correspondence, and without prejudice to what discovery may otherwise reveal, Defendants Farris and Zobel led the GMU Policy.

96.     According to their publicly available biographies, neither Mr. Farris nor Ms. Zobel has any medical credentials.

97.     Mr. Farris earned an undergraduate degree in Biology, a master's degree in Business Administration, and a Ph.D. in Education; he began employment at GMU as "Chemical Hygiene Officer" and subsequently was also tasked with fire-safety management responsibilities.

98.     Ms. Zobel holds a bachelor's degree in Hazardous Materials/Environmental Management and Civil Engineering, a master's degree in Civil Engineering, and a Ph.D. in Biodefense.

99.     On July 21, 2021, Professor Zywicki, through his counsel at NCLA, the undersigned, sent a letter to GMU representatives demanding that his naturally acquired immunity

be recognized as equivalent to vaccine immunity and that the University respond by July 28, 2021, due to the tight timetable. (Attachment G).

100.    Through his physician, Dr. Noorchashm, Professor Zywicki requested an exemption on medical grounds, submitted July 23, 2021.  Dr. Noorchashm stated that a vaccine posed a risk of harm to Professor Zywicki as a result of his naturally acquired immunity. (Attachment H).

101.    GMU responded to NCLA's letter on July 30, 2021 and denied Professor Zywicki's request. It would not allow him a medical exemption on the grounds cited and did not recognize the validity of his legal arguments and contention that he should be treated as though he were vaccinated. (Attachment I).

102.    Citing two CDC webpages, the letter states that "Mason is not currently exempting individuals who previously had COVID-19 from the vaccination requirement as such an exemption is not consistent with the guidance issued by the CDC." (Attachment I).

103.    This guidance – which underpinned GMU's denial of Professor Zywicki's request – itself states that reinfection from COVID-19, "although rare," is possible.  *See Frequently Asked Questions about COVID-19 Vaccination*, CDC (June 15, 2021), *available at* https://www.cdc.gov/coronavirus/2019-ncov/vaccines/faq.html (last viewed Aug. 3, 2021).

104.    Likewise, the same webpage acknowledges that "[e]xperts are still learning more about how long vaccines protect against COVID-19" and that "[w]e don't know how long protection lasts for those who are vaccinated." *Id.*

105.    According to Drs. Bhattacharya and Kulldorff, the CDC guidance is inapposite, as it does not address the extensive scientific literature contained in their declaration.  Joint Decl. ¶ 36.

106.    Furthermore, "[u]ncertainty over the longevity of immunity after recovery is a specious reason for not exempting COVID recovered patients from vaccination mandates, since the same can be said about vaccine mediated immunity. We do not know how long it will last either, and there is no reason to believe it provides longer lasting or more complete immunity than recovery from COVID." Joint Decl. ¶ 36.

107.    The doctors also note that "the immunological evidence to date suggests that protection against disease will last for years" and that "uncertainty over the longevity of immunity after recovery is a specious reason for not exempting COVID recovered patients from vaccination mandates, since the same can be said about vaccine mediated immunity." Joint Decl. ¶ 36.

108.    Bhattacharya and Kulldorff also point out that "just as reinfections are possible though rare after COVID recovery, breakthrough infections are possible after vaccination, as the CDC's team investigating vaccine breakthrough infections itself recognizes."  Joint Decl. ¶ 37.  In fact, the CDC FAQ webpage upon which GMU relies states "[w]e don't know how long protection lasts for those who are vaccinated."  *Id.*

109.    The question that the CDC is addressing here is not even the one in contention, they go on to explain.  Joint Decl. ¶ 38.  The CDC is attempting to "help people understand that it is safer to attain immunity against SARS-CoV-2 infection via vaccination rather than via infection. This is a point not in dispute.  Rather, the question is whether someone who already has been infected and recovered will benefit on net from the additional protection provided by vaccination. On this point, the CDC's statement in the FAQ is non-responsive, and ignores the scientific evidence."  Joint Decl. ¶ 38.

110.    On August 2, 2021, GMU sent Professor Zywicki an email noting that he had not yet uploaded proof of vaccination into the online portal, and that if he does not do so, he will "be

out of compliance with this requirement and subject to disciplinary action, which can lead to being placed on unpaid administrative leave or eventual termination of employment." (Attachment J).

## VI. PROFESSOR ZYWICKI HAS EXPERIENCED, AND WILL CONTINUE TO EXPERIENCE, CONCRETE AND PARTICULARIZED HARM AS A DIRECT CONSEQUENCE OF GMU'S VACCINE POLICY

111.   To remain unvaccinated without facing disciplinary action, Professor Zywicki must obtain an exemption to work at home. Otherwise, he must comply with punitive masking, testing, and social-distancing requirements, while facing the prospect of disciplinary action, including termination of employment and lost eligibility for merit pay raises. Under any of these scenarios, Professor Zywicki's personal autonomy and ability to perform his professional duties is being infringed upon.

112.   Professor Zywicki is slated to teach 61 students in a first-year contracts course and 15 students in his public choice and public law seminar. These students enrolled in the course with the expectation of in-person instruction.

113.   Masking requirements hinder Professor Zywicki's ability to communicate with students in a lecture environment.

114.   The social distancing mandate prevents him from holding office hours or having lunches with students, participating in faculty workshops and meetings, and attending various academic events.

115.   Likewise, frequent testing is burdensome, invasive, painful, and carries its own risk of physical injury.

116.   Obviously, exercising a remote teaching option deprives students of the learning experience they signed up for, since presence in a classroom is crucial to effective instruction.

117.   By imposing such impediments, the Policy prevents Professor Zywicki from carrying out his responsibilities as successfully as his vaccinated colleagues, jeopardizing his teaching evaluations, future student enrollment, opportunities for academic collaboration, reputational standing, pay raises, and other professional opportunities.

118.   The Policy further damages Professor Zywicki by making disclosure of vaccination status a prerequisite for merit-based pay increases and threatening disciplinary action—including forced unpaid leave and termination of employment—if he does not obtain an exemption (religious or medical) or a COVID-19 vaccine.  (Attachments C, D, & E).

119.   Thus, although the Policy purports not to require vaccination, in reality and in effect it exerts such an enormous amount of pressure on Professor Zywicki to subject himself to receiving the vaccine (to avoid being professionally handicapped and facing loss of employment) that it amounts to an ineluctable mandate.  It is obviously designed for that purpose and to have that impact.

120.   By threatening adverse professional and personal consequences, GMU's Policy not only directly and palpably harms Professor Zywicki's bodily autonomy and dignity, but it forces him to endure the stress and anxiety of choosing between his teaching career and his health.

121.   The risk-avoidance benefits that the Policy provides, compared to the restrictions and intrusive options offered to Professor Zywicki are disproportionate.  Similarly, given that naturally acquired immunity confers equal or greater protection than that provided by the vaccines (especially with respect to some of the WHO-approved vaccines GMU considers adequate to fulfill the Policy's requirements), the Policy is arbitrary and irrational.  There is no indication that the Policy is tailored to account for its impact on those who have acquired natural immunity.

122.     Professor Zywicki requires relief on a tight timeline because GMU did not send the final email about its policy until a mere three weeks before the deadline it set for employees to receive the vaccine.  (Attachments D & E).  Any school's academic calendar may include minor deviations from year to year but typically includes Fall, Spring, and Summer semesters or programs.  It has thus been foreseeable to GMU for months that Fall Semester law school classes would begin in August 2021.

## CLAIMS FOR RELIEF

### COUNT I: VIOLATION OF THE RIGHT TO REFUSE UNWANTED AND MEDICALLY UNNECESSARY MEDICAL CARE

1.  Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

2.  GMU's coercive Policy requires Professor Zywicki to take a vaccine without his consent—and against the expert medical advice of his immunologist—thereby depriving him of his ability to refuse unwanted medical care.

3.  The Supreme Court has recognized that the Ninth and Fourteenth Amendments protect an individual's right to privacy.  A "forcible injection … into a nonconsenting person's body represents a substantial interference with that person's liberty[.]"  *Washington v. Harper*, 494 U.S. 210, 229 (1990).  The common law baseline is also a relevant touchstone out of which grew the relevant constitutional law. *See, e.g., Cruzan v. Dir., Mo. Dep't of Public Health*, 497 U.S. 261, 278 (1990) ("'At common law, even the touching of one person by another without consent and without legal justification was a battery').  *See* W. Keeton, D. Dobbs, R. Keeton, & D. Owen, PROSSER AND KEETON ON LAW OF TORTS § 9, pp. 39-42 (5th ed. 1984).); *Schloendorff v. Society of N.Y. Hosp.*, 211 N.Y. 125, 129-130, 105 N.E. 92, 93 (1914) (Cardozo, J.) ('Every human being of adult years and sound mind has a right to determine what shall be done with his own body; and

a surgeon who performs an operation without his patient's consent commits an assault, for which he is liable in damages.').

4.      Subsequent Supreme Court decisions have made explicit that the Constitution protects a person's right to "refus[e] unwanted medical care." *Cruzan*, 497 U.S. at 278; *King v. Rubenstein*, 825 F.3d 206, 222 (4th Cir. 2016) (recognizing same).

5.      This right is "so rooted in our history, tradition, and practice as to require special protection under the Fourteenth Amendment." *Washington v. Glucksberg,* 521 U.S. 702, 722 n.17 (1997).

6.      The Court has explained that the right to refuse medical care derives from the "well-established, traditional rights to bodily integrity and freedom from unwanted touching." *Vacco v. Quill*, 521 U.S. 793, 807 (1997).

7.      Coercing employees to receive an EUA vaccine for a virus that presents a near-zero risk of illness or death to them and which they are exceedingly unlikely to pass on to others, because those employees already possess natural immunity to the virus, violates the liberty and privacy interests that the Ninth and Fourteenth Amendments protect.

8.      When a state policy implicates a fundamental right, through coercion or otherwise, the strict scrutiny standard "applies[;] a law will not be upheld unless the government demonstrates that the law is necessary to further a compelling governmental interest and has been narrowly tailored to achieve that interest." *Mohamed v. Holder*, 266 F. Supp. 3d 868, 877 (E.D. Va. 2017).

9.      Defendants cannot show that they have a compelling interest in coercing Professor Zywicki into taking a COVID-19 vaccine, because GMU has no compelling interest in treating employees with natural immunity any differently from employees who obtained immunity from a vaccine.

10.     Substantial research establishes that a COVID-19 infection creates immunity to the virus at least as robust, durable, and long-lasting as that achieved through vaccination. Noorchashm Decl. ¶¶ 16-17; Joint Decl. at ¶¶ 15-23); Nabin K. Shrestha, et al., *Necessity of COVID-19 Vaccination In Previously Infected Individuals*, MEDRXIV (June 5th, 2021), *available at* https://bit.ly/2TFBGcA (last visited Aug. 1, 2021); *see also* Yair Goldberg, et al., *Protection of Previous SARS-Cov-2 Infection Is Similar to That of BNT162b2 Vaccine Protection: A Three-Month Nationwide Experience From Israel*, MEDRXIV (Apr. 20, 2021), *available at* https://bit.ly/3zMV2fb (last visited Aug. 1, 2021); Smerconish, *Should Covid Survivors and the Vaccinated Be Treated the Same?*: CNN Interview with Jay Bhattacharya, Professor of Medicine at Stanford University (June 12, 2021), *available at* https://cnn.it/2WDurDn (last visited Aug. 1, 2021); Marty Makary, *The Power of Natural Immunity*, WALL STREET JOURNAL (June 8, 2021), *available at* https://on.wsj.com/3yeu1Rx (last visited Aug. 1, 2021).

11.     In recognition of the highly protective character of natural immunity, the European Union has recognized "a record of previous infection" as a substitute for any vaccine passport requirements.   Noorchashm Decl. ¶ 27.  Even France's controversial new restrictive mandate on the ability to participate in daily life focuses on a person's immunity rather than their vaccine status—treating natural immunity and vaccine immunity equally.  *See, e.g.*, Clea Callcutt, *France forced to soften rules after coronavirus green pass backlash*, POLITICO (July 20, 2021), *available at* https://politi.co/3f9AZzS (last visited July 29, 2021).

12.     Similarly, the United States requires everyone, including its citizens, to provide proof of a negative COVID-19 test before returning to the country from abroad. Documentation of recovery suffices as a substitute, although proof of vaccination does not.  *See Requirement of Proof of Negative COVID-19 Test or Recovery from COVID-19 for All Air Passengers Arriving*

*in the United States*, CDC (July 6, 2021), *available at* https://bit.ly/3yfcJDM (last visited July 28, 2021).

13.     Indeed, the CDC recently acknowledged that vaccinated individuals appear to be spreading COVID-19 at rates similar to unvaccinated (but not naturally immune) people.  That further underscores the arbitrary nature of GMU's policy.  *Where's the data*?, WASHINGTON POST (July 28, 2021), *available at* wapo.st/2THpmIQ  (last visited July 30, 2021).

14.     Likewise, recent data from Israel suggest that individuals who receive the Pfizer Vaccine can pass the virus onto others a mere few months after receiving it.

15.     The Commonwealth of Virginia's public policy has also traditionally reflected that it lacks any interest in vaccinating persons for a disease to which they carry antibodies.  For instance, the law mandating vaccination of school children for measles, mumps, rubella, and varicella (chickenpox) *explicitly exempts* from the requirements those who can demonstrate existing immunity through serological testing that measures protective antibodies.  12 Va. Admin. Code § 5-110-80 (2021).

16.     GMU simply has no compelling interest in departing from the Commonwealth's typical public policy in this case.  There is no question that Professor Zywicki has natural immunity, given his recent antibodies screening test demonstrating ongoing and robust immune protection as confirmed by his immunologist and Dr. Bhattacharya.  Noorchashm Decl. ¶ 7; Joint Decl. ¶ 36.

17.     In addition to GMU's lack of interest in requiring that already immune employees get vaccinated, Defendants cannot show that the Policy is narrowly tailored to any compelling governmental interest.

18. Any interest that GMU may have in promoting immunity on campus does not extend to those employees who already have natural immunity—particularly those who can demonstrate such immunity through antibody screenings.

19. Similarly, the much lower effectiveness of the Janssen, Sinovac, and Sinopharm vaccines in preventing infection, compared to natural immunity, renders Professor Zywicki far less likely to contract or spread the virus than his colleagues who have been immunized with these inferior vaccines. Yet having taken any of them would leave an otherwise similarly situated colleague at the law school free of GMU's restrictive Policy.

20. By failing to tailor its Policy to only those employees who lack immunity, GMU's Policy forces employees like Professor Zywicki, who have robust natural immunity, to choose between their health, their personal autonomy, and their careers.

21. Professor Zywicki has suffered and will continue to suffer damage from Defendants' conduct. There is no adequate remedy at law, as there are no damages that could compensate Professor Zywicki for the deprivation of his constitutional rights. He will suffer irreparable harm unless this Court enjoins Defendants from enforcing their Policy.

22. Professor Zywicki is entitled to a judgment declaring that the Policy violates his constitutional right to refuse medical treatment and an injunction restraining Defendants' enforcement of the Policy.

### COUNT II: VIOLATION OF THE UNCONSTITUTIONAL CONDITIONS DOCTRINE AND THE FOURTEENTH AMENDMENT'S RIGHT TO DUE PROCESS

23.    Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

24.    Unconstitutional conditions case law often references the existence of varying degrees of coercion.  According to that body of law, GMU cannot impair Professor Zywicki's right to refuse medical care through subtle forms of coercion any more than it could through an explicit mandate.  *See, e.g.*, *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595 (2013) ("[U]nconstitutional conditions doctrine forbids burdening the Constitution's enumerated rights by coercively withholding benefits from those who exercise them"); *Memorial Hosp. v. Maricopa Cty.*, 415 U.S. 250 (1974) ("[An] overarching principle, known as the unconstitutional conditions doctrine … vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up").

25.    The Due Process Clause of the Fourteenth Amendment provides: "nor shall any state deprive any person of life, liberty, or property, without due process of law … ."  U.S. Const., amend. XIV, sec. 1.

26.    Professor Zywicki possesses both a liberty interest in his bodily integrity and, as a tenured professor, a property interest in his teaching career.

27.    It is less appreciated in legal circles that, to prevail, unconstitutional conditions claims do not need to establish that a challenged government policy amounts to coercion.  Instead, it is sufficient that the state policy burden a constitutional right by imposing undue pressure on an otherwise voluntary choice with a nexus to the exercise of a constitutional right.  In other words, the presence of some remaining voluntarism after new conditions are imposed on the exercise of a constitutional right does not stand as a barrier to establishing a successful unconstitutional

conditions claim. This is especially true when a government actor couples an unconstitutional condition with a procedural system stacked against the right-holder.

28.     For example, in *Speiser v. Randall*, 357 U.S. 513 (1958), the Court invalidated a loyalty oath imposed as a condition for veterans to obtain a state property tax exemption, even though (a) California citizens were not required to own real property, of course; (b) California veterans could freely opt not to seek the exemption and simply pay the unadorned tax; and (c) California was not even obligated to provide veterans with the exemption but rather the exemption was a mere privilege.

29.     The *Speiser* Court deemed the oath condition unconstitutional in part because the burden to establish qualification for the exemption was placed on applicants. *See id.* at 522. The question the Supreme Court saw itself deciding was "whether this allocation of the burden of proof, on an issue concerning freedom of speech, falls short of the requirements of due process." *Id.* at 523.

30.     The Court addressed this question by stating the guiding principle that

> Where one party has at stake an interest of transcending value—as a criminal defendant his liberty—this margin of error is reduced as to him by the process of placing on the other party the burden of producing a sufficiency of proof in the first instance …. [But] Due process commands that no man shall lose his liberty unless the Government has borne the burden of producing the evidence and convincing the factfinder of his guilt.

*Id.* at 525-26.

31.     Here, the analogue of the criminal defendant rights of "transcending value" referenced in *Speiser* are the liberty rights of all persons to be free of unconsented-to bodily intrusions and medical interventions. This means that unconstitutional conditions doctrine and due process rights *combine* to invalidate the Policy. That result occurs because GMU has not and

cannot show that the school's forcing Professor Zywicki to take the vaccine reduces any risk that he will become infected with and spread the virus to GMU students and personnel. *See also Lawrence v. Texas*, 539 U.S. 558, 562 (2003) (The Due Process Clause protects "liberty of the person both in its spatial and in its more transcendent dimensions").

32.    Similar to the California law in *Speiser* "creat[ing] the danger that … legitimate utterance will be penalized," 357 U.S. at 526, the process GMU has established in relation to taking COVID-19 vaccines poses dangers to Professor Zywicki's health (and thus to his liberty interests) as well as threatening him with various forms of penalties and other detriments.

33.    Indeed, more so than in *Speiser*, the factual issues involved in this case are complex. "How can a claimant … possibly sustain the burden of proving the negative of these complex factual elements?   In practical operation, therefore, this procedural device must necessarily produce a result which the State could not command directly."  *Id.*  There is perhaps no better encapsulation by the Supreme Court of how unconstitutional conditions doctrine and Due Process can and do intersect and reinforce one another.  *See also id.* at 529 ("The State clearly has no such compelling interest at stake as to justify a short-cut procedure which must inevitably result in suppressing protected speech.").  The Commonwealth of Virginia's GMU similarly possesses no compelling interest that could justify its defective Policy that will inevitably result in at least some unwarranted medical intrusions into the bodies of members of the GMU community.

34.    For these reasons, GMU cannot by means of its Policy effectively flip the burden of proof and require Professor Zywicki to prove that it is safe for him to teach without being vaccinated.  And setting up such a process, which is what GMU's Policy does, thereby represents

a concurrent *procedural* due process violation and an unconstitutional condition burdening his liberty interests to be free of unwanted medical interventions.

35.     *Speiser* also rests on the mismatch between the loyalty oath California required and the grant of a property tax exemption to veterans.  "[T]he State is powerless to erase the service which the veteran has rendered his country; though he be denied a tax exemption, he remains a veteran."  *Id.* at 528.

36.     In this situation, there is an equally jarring logical incongruity.  GMU's Policy is terse.  It offers no justifications for why the penalties and other restrictions it establishes are appropriate and tailored to members of the University community that have acquired robust natural immunity.  Whatever GMU is trying to decree through its unconstitutional-conditions sleight of hand, Professor Zywicki remains a University community member with natural immunity as a matter of pre-Policy fact (just as the *Speiser* veterans remained veterans as a matter of pre-tax law fact), and the existence of such immunity fully serves the supposed purposes of the public-health protection that GMU says that it is pursuing.

37.     The proportionality of the Policy is also deficient because the Policy does not seek to assess the current antibody levels of its targets, something that is it is now feasible for medical science to test.[6]  For the Policy is not a mere presumption that vaccination is superior to natural immunity (a contention that would have to be borne out by the science in any event or else GMU had no business adopting its Policy) that Professor Zywicki can try to overcome.  No, the Policy

---

[6] Such antibody testing was not feasible more than a century ago when *United States v. Jacobson* was decided, as diagnostic antibody testing was not invented until the 1970's.  197 U.S. 11 (1905) (upholding a city regulation fining individuals $5 if they refused to take Smallpox vaccine).  *See The history of ELISA from creation to COVID-19 research*, MOLECULAR DEVICES, *available at* https://www.moleculardevices.com/lab-notes/microplate-readers/the-history-of-elisa (last visited Aug. 1, 2021).

is, in essence, *a conclusive presumption* that vaccination (even as to vaccines of far-lesser efficacy) is required unless the risks of the vaccine to a particular recipient warrant a special exception.  But what if Professor Zywicki and others with natural immunity possess *higher* levels of antibodies than at least many of those who took one or more of the various inferior vaccines?  And why has GMU deemed all vaccines to be equally protective in the fictitious presumption it has established?  Finally, is there any scientific basis for the presumptions GMU has built into its Policy?  The Policy answers none of these questions.  It does not even try.

For these reasons, the *de facto* presumptions the Policy establishes also become another part of GMU's procedural due process violations that also run afoul of unconstitutional conditions doctrine.  In short, allocating burden of proof responsibility to those with natural immunity like Professor Zywicki, coupled with GMU's stacking the process with presumptions Plaintiff will show are scientifically unwarranted, contravene the Due Process Clause.  *See Perry v. Sinderman*, 408 U.S. 592, 597 (1972) (holding that the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests"); *Wieman v. Updegraff*, 344 U.S. 183, 192 (1952) ("We need not pause to consider whether an abstract right to public employment exists. It is sufficient to say that constitutional protection does extend to the public servant whose exclusion pursuant to a statute is patently arbitrary or discriminatory").

38.    "Since the entire statutory procedure, by placing the burden of proof on the claimants, violated the requirements of due process, appellants were not obliged to take the first step in such a procedure."  *Id.* at 529.  Just so here.  GMU's Policy makes a mockery of due process.  As a result, Professor Zywicki was not even obligated to take the first step in the Policy to gain an exception from its terms.  Nevertheless, Professor Zywicki went above and beyond and applied for a medical exemption anyway.  But the Policy's burden-shifting and erroneous

embedded presumptions worked just as GMU designed them, leading unsurprisingly to the predictable *ex ante* outcome that Professor Zywicki was going to be denied a medical exemption. Professor Zywicki gave the deficient process set out in the Policy more than the benefit of the doubt, but it has now become apparent that it is as flawed in practice as it appears on its face.

## COUNT III—VIOLATION OF THE SUPREMACY CLAUSE

39.     Plaintiff realleges and incorporates by reference all the foregoing allegations as though fully set forth herein.

40.     Defendants' Policy requires Professor Zywicki to receive a vaccine in order to teach effectively without regard to his natural immunity or the health risks he faces.

41.      He also must divulge personal medical information by uploading it into an online portal and is threatened with disciplinary action if he declines to comply with these arbitrary mandates.

42.     The Policy thus coerces or, at the very least, unduly pressures Professor Zywicki into getting a vaccine that FDA approved only for emergency use.

43.     The United States Constitution and federal laws are the "Supreme Law of the Land" and supersede the constitutions and laws of any state.  U.S. Const. art. VI, cl. 2.

44.     "State law is pre-empted to the extent that it actually conflicts with federal law." *English v. General Elec. Co*., 496 U.S. 72, 79 (1990) (internal citations and quotation marks omitted).

45.     Federal law need not contain an express statement of intent to preempt state law for a court to find any conflicting state action invalid under the Supremacy Clause.  *See Geier v. American Honda*, 520 U.S. 861, 867-68 (2000).

46.     Rather, federal law preempts any state law that creates "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona v. United States*, 567 U.S. 387, 399-400 (2012).

47.     The EUA statute mandates informed and voluntary consent.  *See John Doe No. 1 v. Rumsfeld*, No. Civ. A. 03-707(EGS), 2005 WL 1124589, *1 (D.D.C. Apr. 6, 2005) (allowing use of anthrax vaccine pursuant to EUA "on a *voluntary* basis").  *See also* 21 U.S.C. § 360bbb-3(e)(1)(A)(ii).

48.     It expressly states that recipients of products approved for use under it be informed of the "option to accept or refuse administration," and of the "significant known and potential benefits and risks of such use, and of the extent to which such benefits and risks are unknown." *Id.*

49.     Since GMU's Policy (a state program) coerces Professor Zywicki by making enjoyment of his constitutionally and statutorily protected consent rights contingent upon receiving an experimental vaccine, it cannot be reconciled with the letter or spirit of the EUA statute.  *See* 21 U.S.C. § 360bbb-3.

50.     The conflict between the Policy and the EUA statute is particularly stark given that the statute's informed consent language requires that recipients be given the "option to refuse" the EUA product.  That is at odds with the Policy's forcing Professor Zywicki to sustain significant injury to his career if he does not want to take the vaccine (in light of masking, frequent testing, social distancing, and looming disciplinary action).

51.     Put differently, the Policy frustrates the objectives of the EUA process. *See Geier*, 520 U.S. at 873 (citing *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

52.     As noted above, OLC made a memorandum available to the public on July 27, 2021 (dated July 6, 2021) opining that the EUA status of a medical product does not preclude vaccine mandates that might be imposed by either the public or private sectors.  *See* "Memorandum Opinion for the Deputy Counsel to the President," *Whether Section 564 of the Food, Drug, and Cosmetic Act Prohibits Entities from Requiring the Use of a Vaccine Subject to an Emergency Use Authorization* (July 6, 2021) (OLC Op.) at 7-13, *available at* https://www.justice.gov/olc/file/1415446/download (last visited Aug.1, 2021).

53.     Of course, the separation of powers dictates that this Court is not bound by the OLC Opinion—an advisory opinion written by the Executive Branch for the Executive Branch.  *See Citizens for Responsibility & Ethics in Wash. v. Office of Admin.*, 249 F.R.D. 1 (D.C. Cir. 2008) ("OLC opinions are not binding on the courts[; though] they are binding on the executive branch until withdrawn by the Attorney General or overruled by the courts[.]") (cleaned up).

54.     Relatedly, the Justice Department until only days ago took a very different approach.  *See* Attorney General Memorandum, *Balancing Public Safety with the Preservation of Civil Rights* (Apr. 27, 2020), *available at* https://www.justice.gov/opa/page/file/1271456/download (last visited Aug. 1, 2021, 2021) ("If a state or local ordinance crosses the line from an appropriate exercise of authority to stop the spread of COVID-19 into an overbearing infringement of constitutional and statutory protections, the Department of Justice may have an obligation to address that overreach in federal court.").  *See also* Kevin Liptak, CNN, *Biden Jumps Into Vaccine Mandate Debate as VA Requires Health Workers to Get Vaccinated* (July 26, 2021) ("The [new OLC] opinion marks a reversal from the previous administration.  Last year, Attorney General William Barr used the Justice Department's legal power to try to fight certain Covid

restrictions, including joining some businesses that sought to overturn state mask mandates."), *available at* cnn.it/37bwAbl (last visited Aug. 1, 2021).

55.     Moreover, the OLC Opinion is entirely silent on the issue of preemption.  As such, it cannot be read even as offering a potentially persuasive legal view on whether the GMU Policy is preempted by the EUA statute or not.  In light of what this Count pleads, the OLC opinion is a legal *non sequitur*.

56.     The OLC Opinion is also premised on faulty reasoning.  While recognizing that EUA products have "not yet been generally approved as safe and effective," and that recipients must be given "the option to accept or refuse administration of the product," the Opinion nevertheless maintains that the EUA vaccines can be mandated.  OLC Op. at 3-4, 7.

57.     According to OLC, the requirement that recipients be "informed" of their right to refuse the product does not mean that an administrator is precluded from mandating the vaccine. All that an administrator must do, in OLC's view, is tell the recipient they have the *option* to refuse the vaccine.  *Id.* at 7-13.[7]  That facile interpretation sidesteps the fact that the Policy's employment consequences effectively coerce or at least unconstitutionally leverage the GMU community into taking the vaccine, reducing to nothingness both the constitutional and statutory rights of informed consent.  This approach of stating the obvious but ignoring competing arguments is likely why the Opinion remained mum on the doctrine of preemption.

---

[7] The OLC opinion is as irrelevant to the constitutional questions in this case posed by Counts I and II as it is to the preemption questions in Count III.  For it was no answer in *Speiser* to the due process and unconstitutional conditions problems created by California's property tax exemption and oath system to quickly breathe a sigh of relief because California tax authorities could simply tell veterans applying for the tax exemption that they could just go away and forgo the tax exemption.  The Constitution and the text of congressional statutes cannot be so easily dodged.

58.     Recognizing the illogic of the Opinion and its inability to square its construction with the text of the EUA statute, OLC admits that its "reading … does not fully explain why Congress created a scheme in which potential users of the product would be informed that they have 'the option to accept or refuse' the product." *Id.* at 10.  This understatement would be droll but for the serious rights at stake, especially given that the elephant in the room—which the OLC Opinion ignores—is the Supremacy Clause and the preemption doctrine that Clause powers.  In truth, Congress called for potential users to be informed precisely so that they could refuse to receive an EUA product.  OLC's obtuse reading of the statute blinks reality.

59.     In other words, nothing in the OLC Opinion addresses the fact that if it were taken as a blanket authorization for state and local governments to impose vaccine mandates, a vital portion of the EUA statute's text would be rendered superfluous.  *See, e.g., TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.") (cleaned up).

60.     Yet, OLC turns around and claims that Congress would have explicitly stated if it intended to prohibit mandates for EUA products.  *Id.* at 8-9.  But Congress *did* say so.  The plain language states that the recipient of an EUA vaccine must be informed "of the option to accept or refuse the product."   21 U.S.C. § 360bbb-3(e)(1)(A)(ii).  Especially when read against the backdrop of what the Constitution requires *and* against the common law rules from which the constitutional protections for informed consent arose, Congress's intent to protect informed consent is pellucid.  And Congress "is understood to legislate against a background of common-law … principles," *Astoria Fed. Sav. & Loan Assn. v. Solimino*, 501 U.S. 104, 108 (1991).

61.     The EUA statute's prohibition on mandating EUA products is reinforced by a corresponding provision that allows the President, in writing, to waive the option of those in the U.S. military to accept or refuse an EUA product if national security so requires.  10 U.S.C. § 1107a(a)(1).  That provision would be redundant if consent could be circumvented merely by telling a vaccine recipient that he or she is free to refuse the vaccine but would nonetheless encounter various adverse consequences that violated unconstitutional conditions doctrine.

62.     To circumvent the statutory text about the military waiver, OLC spins out a tortured argument under which the President's waiver would merely deprive military members of their rights to *know* that they can refuse the EUA product—rather than waiving their rights to actually refuse the product.  OLC Op. at 14-15.

63.     Unsurprisingly, OLC's strained reading runs counter the Department of Defense's understanding of this statutory provision.  As the OLC Opinion acknowledges, "DOD informs us that it has understood section 1107a to mean that DOD may not require service members to take an EUA product that is subject to the condition regarding the option to refuse, unless the President exercises the waiver authority contained in section 1107a."  *Id.* at 16 (citing DOD Instruction 6200.02, § E3.4 (Feb. 27, 2008)).

64.     OLC even acknowledges that its opinion is belied by the congressional conference report, which also contemplated that 10 U.S.C. § 1107a(a)(1) "would authorize the President to waive *the right of service members to refuse administration of a product* if the President determines, in writing, that affording service members the right to refuse a product is not feasible[.]"  *Id.* (quoting H.R. Rep. No. 108-354, at 782 (2003) (Conf. Rep.)).

65.     Unlike OLC, this Court must not ignore the plain statutory prohibition on mandating EUA products.  Though released to much fanfare in the media, the Court should discount the severely flawed OLC Opinion in its entirety, affording it no weight in this litigation.

66.     Just as Congress prohibited the federal government from mandating EUA products, the state governments cannot do so, for the Supremacy Clause dictates that the EUA statute must prevail over conflicting state law or policy.

67.     Defendants' Policy is thus preempted by federal law.  *See* U.S. Const. art. VI, cl. 2; *see also Kindred Nursing Ctrs. Ltd P'ship v. Clark*, 137 S. Ct. 1421 (2017) (holding that Federal Arbitration Act preempted incompatible state rule); *Hughes v. Talen Energy Marketing, LLC*, 136 S. Ct. 1288, 1297 (2016) ("federal law preempts contrary state law," so "where, under the circumstances of a particular case, the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" the state law cannot survive).

68.     Defendants' Policy is invalid pursuant to Article VI, Cl. 2 of the United States Constitution, and must be enjoined and set aside.

## ADDITIONAL LEGAL CLAIMS

69.     Professor Zywicki has suffered and will continue to suffer damage from Defendants' conduct.  There is no adequate remedy at law, as there are no damages that could compensate Professor Zywicki for the deprivation of his constitutional or statutory rights.  He will suffer irreparable harm unless this Court enjoins Defendants from enforcing their Policy.

70.     42 U.S.C. § 1983 provides a civil right of action for deprivations of constitutional protections taken under color of law.

71.     Professor Zywicki is entitled to declaratory and injunctive relief pursuant to 42 U.S.C. § 1983 because he is being deprived of "rights, privileges, or immunities secured by the Constitution and laws."  Section 1983 thus supports both Professor Zywicki's constitutional and statutory causes of action against the GMU defendants because Section 1983 protects rights "secured by the Constitution *and* laws."  42 U.S.C. § 1983 (emphasis added).

72.     Likewise, Professor Zywicki is entitled to injunctive relief pursuant to *Ex parte Young*'s nonstatutory equitable right of action.  *See Verizon Md., Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 648 (2002) ("We conclude that 28 U.S.C. § 1331 provides a basis for jurisdiction over Verizon's claim that the Commission's order requiring reciprocal compensation for ISP-bound calls is pre-empted by federal law. We also conclude that the doctrine of *Ex parte Young* permits Verizon's suit to go forward against the state commissioners in their official capacities.").

73.     In sum, Professor Zywicki is entitled to a judgment declaring that the Policy violates the Supremacy Clause and an injunction restraining Defendants' enforcement of the Policy, since it is preempted by federal law.

## **RELIEF REQUESTED**

**WHEREFORE,** Plaintiff respectfully requests that the Court find the Defendants have committed the violations alleged and described above, and issue in response the following:

A.  A declaratory judgment that GMU's Policy infringes upon Plaintiff's constitutionally protected rights to protect his bodily integrity and to refuse unnecessary medical treatment.

B.  A declaratory judgment that GMU's Policy represents an unconstitutional condition, especially in light of a set of explicit and implicit procedures established in the Policy that violates the Due Process Clause of the Fourteenth Amendment.

C.  A declaratory judgment that GMU's Policy violates the Supremacy Clause of the United States Constitution because the Policy, a state program, conflicts with the federal EUA Statute; AND

D. Injunctive relief restraining and enjoining Defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them (*see* Fed. R. Civ. P. 65(d)(2)), and each of them, from enforcing coercive or otherwise pressuring policies or conditions similar to those in the Policy that act to compel or try to exert leverage on GMU employees with natural immunity to get a COVID-19 vaccine.

## <u>JURY DEMAND</u>

Plaintiff herein demands a trial by jury of any triable issues in the present matter.

August 3, 2021

Respectfully submitted,

/s/ Matthew D. Hardin
Matthew D. Hardin, VSB #87482
Hardin Law Office
1725 I Street NW, Suite 300
Washington, DC 20006
Telephone: 202-802-1948
Email: HardinLawPLLC@icloud.com

*Local Counsel for the Plaintiff*

/s/Jenin Younes
Jenin Younes*
Litigation Counsel
NEW CIVIL LIBERTIES ALLIANCE
1225 19th Street NW, Suite 450
Washington, DC 20036
Telephone: (202) 869-5210
Facsimile: (202) 869-5238
jenin.younes@ncla.legal
*Pro hac vice application forthcoming*

\* Admitted only in New York.  DC practice limited to matters and proceedings before United States courts and agencies. Practicing under members of the District of Columbia Bar.

*Attorney for Plaintiff*