# ATTACHMENT F

# New Civil Liberties Alliance

July 21, 2021

Dr. Gregory Washington
President of George Mason University
president@gmu.edu

Mr. Thomas Moncure
University Counsel and Senior Assistant
Attorney General
tmoncure@gmu.edu

Mr. David Farris
Executive Director, Safety and
Emergency Management
dfarris@gmu.edu

Ms. Julie Zobel
Assistant Vice President of Safety,
Emergency, and Enterprise Risk
Management
jzobel@gmu.edu

**VIA EMAIL**

    Re:    GMU's Reopening Policy for Fall 2021
             On Behalf of NCLA Client, Professor Todd Zywicki

Dear Dr. Washington, Mr. Moncure, Mr. Farris, and Ms. Zobel:

    It has come to our attention that George Mason University (GMU) has announced a reopening policy (the Policy) related to COVID-19 for the Fall 2021 semester. The Policy requires all unvaccinated faculty and staff members, including those who can demonstrate natural immunity through a prior COVID-19 infection, to wear masks on campus, physically distance, and undergo frequent COVID-19 testing. The Policy also seeks to strip employees who choose not to share their vaccination status (the statement delineating the Policy does not specify with whom), of their eligibility for future merit pay increases.[1]

---

[1] The student policy is even more stringent, as it threatens students with suspension if they make the personal decision

The New Civil Liberties Alliance (NCLA) represents Professor Todd Zywicki of the Antonin Scalia Law School's faculty in this matter. Professor Zywicki contracted and has fully recovered from COVID-19. As a result, he acquired robust natural immunity as confirmed in multiple positive SARS-CoV-2 antibody tests conducted over the past year. Professor Zywicki's immunologist, Dr. Hooman Noorchashm, has advised him that, based on his personal medical and immunity status, it is not only *medically unnecessary* to undergo a vaccination procedure at the current time, but that doing so would create an affirmative risk of harm to him (*see* Declaration of Dr. Hooman Noorchashm, attached as Exhibit A). Yet, if he follows his doctor's advice and chooses not to receive a COVID-19 vaccine, relying on the robust natural immunity that he earned the hard way, he will be forced to abide by the rules governing unvaccinated employees. Since those rules—including wearing a mask and physically distancing on campus—diminish Professor Zywicki's efficacy in performing his professional responsibilities, the Policy coerces him into receiving the vaccine.

Given his robust immunity, the Commonwealth of Virginia has no compelling state interest in overriding Professor Zywicki's personal autonomy by effectively forcing him to be vaccinated (or suffer adverse professional consequences if he refuses). As a result, GMU's Policy infringes upon Professor Zywicki's rights under the Ninth and Fourteenth Amendments to the United States Constitution, and he should be exempted from it immediately. NCLA also urges GMU to reconsider its unconstitutional vaccination policy as a general matter, especially for students, faculty, and staff who can show naturally acquired immunity from an antibody test.

I. THE NEW CIVIL LIBERTIES ALLIANCE'S INTEREST IN THIS MATTER

NCLA is a nonpartisan, nonprofit civil-rights organization and public-interest law firm devoted to protecting constitutional freedoms and restoring civil liberties. The "civil liberties" of the organization's name include rights at least as old as the Virginia and U.S. Constitutions themselves, such as trial by jury, due process of law, the right to be tried in front of an impartial and independent judge, the right to free expression without fear of censorship or reprisal, and the right to privacy and personal autonomy. Yet these selfsame rights are also very contemporary—and in dire need of renewed vindication—precisely because Congress, state legislatures, and federal, state, and local administrative agencies, including state university administrations, have trampled them for so long.

Even where NCLA has not yet brought a lawsuit to challenge an unconstitutional exercise of state power or infringement of fundamental rights, it encourages governmental entities to cease

---

to forgo COVID-19 vaccination.

encroaching upon civil liberties of their own volition. We believe that these governmental entities should continuously strive to establish meaningful limitations on administrative policymaking, rulemaking, adjudication, and enforcement, thereby avoiding unconstitutional overreach. For these reasons, NCLA advises GMU to reexamine and revamp its Policy.

## II.  PROFESSOR ZYWICKI AND GMU'S VACCINATION POLICY

Todd J. Zywicki is a GMU Foundation Professor of Law at the Antonin Scalia School of Law. He has been employed at GMU since August 1998, except for occasional service as a visiting professor at other law schools (including Georgetown University Law Center, Vanderbilt University Law School, and Boston College Law School) as well as high-level service in the United States government. He is one of the Law School's most frequently cited and influential scholars and has been an exemplary leader in service to GMU and the community.

On or around March 2, 2020, Professor Zywicki manifested symptoms of COVID-19 for several days, including chills and recurrent night sweats.[2] Fortunately, Professor Zywicki made a full recovery. In April of 2021, Professor Zywicki became ill with the Shingles virus, which caused facial paralysis that lasted for two weeks (*see* Ex. A at ¶ 7(d)).

Since his recovery from COVID-19, Professor Zywicki has undergone repeated SARS-CoV-2 antibody testing, confirming both that he previously contracted COVID-19 and that he has robust antibodies that prevent reinfection. Through American Red Cross (ARC) blood donation testing, Professor Zywicki received an unbroken string of positive COVID-19 antibody tests on July 25, 2020, September 29, 2020, December 16, 2020, and February 9, 2021. Professor Zywicki requested these tests because he had volunteered to teach in-person beginning in the Fall 2020 semester and wanted to reassure students of his immunity status.

Following consultation with Dr. Noorchashm on June 1, 2021, Professor Zywicki obtained a full antibody screening test from LabCorp, which confirmed in greater detail and specificity the ARC test results. According to Dr. Noorchashm, Professor Zywicki's current levels of antibodies and immune protection are "comparable to those" of individuals in his age range and in similar health who have received COVID-19 vaccinations, and these levels provide sufficient and durable protection against reinfection and transmission (*see* Ex. A at ¶ 7(f)).

Based on his analysis of Professor Zywicki's antibodies screening test and overall medical

---

[2] Owing to the scarcity of COVID-19 tests at the time, and the requirement that such tests only be provided by a doctor's order, Professor Zywicki was unable to obtain a PCR test.

history, Dr. Noorchashm concluded that *it is not medically necessary* for Professor Zywicki to undergo a full-course vaccination procedure in order to protect himself or the community from infection. In addition, he determined that such treatment would expose Professor Zywicki to a heightened risk of adverse side-effects that would exceed any speculative benefit the vaccine could confer on someone already protected with antibodies (*see* Ex. A at ¶¶ 12-34). For this reason, Dr. Noorchashm's expert medical opinion is that *prescribing a full vaccine course would violate medical ethics rules which stipulate that any treatment be "medically necessary"* (*see* Ex. A at ¶¶ 9-12) (emphasis added).

On June 28, 2021, via email, GMU announced its "campus reopening and vaccine requirements" for the upcoming Fall term. According to the email, "[a]ll employees will be *strongly encouraged* to get vaccinated, and required to share their vaccination status[.]" (emphasis added). Furthermore, disclosure of vaccination status "will be a prerequisite for eligibility for any merit pay increases." The Policy requires unvaccinated employees to "wear masks while on campus, physically distance, and undergo frequent COVID-19 testing" and contains no mention of exemptions for faculty and staff with naturally acquired immunity to COVID-19 via recovery from prior infection.

Based on personal information and correspondence, Professor Zywicki has been informed that the GMU "campus reopening and vaccine requirements" policy is led by two individuals: David Farris, Executive Director of Safety and Emergency Management[3]; and Julie Zobel, Assistant Vice President, Safety, Emergency and Enterprise Risk Management.[4] Mr. Farris has an undergraduate degree in Biology, a master's degree in Business Administration, and a Ph.D. in Education. He began employment at GMU as "Chemical Hygiene Officer" and subsequently was also tasked with fire safety management responsibilities. Ms. Zobel holds a bachelor's degree in Hazardous Materials/Environmental Management and Civil Engineering, a master's degree in Civil Engineering, and a Ph.D. in Biodefense. Based on their publicly available biographies, neither Mr. Farris nor Ms. Zobel has any medical credentials.

### III. GMU'S POLICY WOULD NOT WITHSTAND A LEGAL CHALLENGE, IN ALL LIKELIHOOD

As an administrative unit of the Commonwealth of Virginia, and in contrast to private employers, those who make policy at public universities such as GMU are legally obligated to ensure that those policies do not violate the United States Constitution.[5] GMU's policy amounts to a vaccine

---

[3] *See* https://ehs.gmu.edu/faculty_staff/david-farris/.
[4] *See* https://ehs.gmu.edu/faculty_staff/julie-zobel/.
[5] *See, e.g., Tinker v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503, 506 (1969) (explaining that "[i]t can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate. This has been the unmistakable holding of this Court for almost 50 years.").

mandate. As courts have recognized, "the line between 'incentive' and 'coercion' is thin."[6] Coercion "by definition, is designed to induce a person to do that which the person offering the incentive wishes done."[7]

Forcing faculty who are not vaccinated to wear masks and socially distance impairs their ability to perform their professional duties. Face coverings impede a professor's ability to effectively communicate with students in a lecture environment. A conspicuous face covering also stigmatizes the wearer, and may create irrational fear, anxiety, and animus from students and other faculty.

Social distancing requirements similarly inhibit a professor's ability to hold office hours or have lunches with students, participate in faculty workshops and meetings, and attend certain academic events. Such impediments mean that unvaccinated professors cannot carry out their responsibilities as effectively as their vaccinated counterparts, jeopardizing teaching evaluations, future student enrollment, opportunities for academic collaboration, reputational standing, pay raises and other professional opportunities. Thus, while the Policy purports not to require vaccination, it places such an enormous amount of pressure upon employees to receive the vaccine (to avoid being professionally handicapped) that it amounts to an ineluctable mandate.[8]

The Supreme Court has recognized that various parts of the Bill of Rights, including the Ninth Amendment, as well as the Fourteenth Amendment, grant privacy rights to individuals. On this basis, it has held that a "forcible injection … into a nonconsenting person's body represents a substantial interference with that person's liberty[.]"[9] Subsequent Supreme Court decisions have made explicit that the right to "refus[e] unwanted medical care"[10] is "so rooted in our history, tradition, and practice as to require special protection under the Fourteenth Amendment."[11] Because the Policy infringes upon a fundamental, constitutional right not to receive a vaccine against one's will, should GMU face a lawsuit on that basis, the school will be required to demonstrate that its Policy furthers a compelling state interest and is narrowly tailored to effectuate that interest.[12]

---

[6] *Enterprises v. Volvo Cars of N.A., LLC*, 2:14-CV-360, 2016 WL 4480343, at *10 (S.D. Ohio Aug. 25, 2016). *See also Kansas v. U.S.*, 214 F.3d 1196, 1202 (10th Cir. 2000) (explaining, in reference to Congress's spending powers, "[t]he boundary between incentive and coercion has never been made clear[.]").
[7] *Enterprises*, 2016 WL 4480343 at *10.
[8] *See Needleman v. Bohlen*, 457 F. Supp. 942, 945-46 (D. Mass. 1978) (recognizing that public employees, including tenured faculty, have a legitimate expectation that future pay-raises or promotions will not be withheld).
[9] *Washington v. Harper*, 494 U.S. 210, 229 (1990).
[10] *Cruzan v. Director, Missouri Department of Public Health*, 497 U.S. 261, 278 (1990).
[11] *Washington v. Glucksberg,* 521 U.S. 702, 722 n.17 (1997).
[12] *See, e.g., Mohamed v. Holder*, 266 F. Supp. 3d 868, 877 (E.D. Va. 2017) ("If a fundamental right is implicated and strict scrutiny therefore applies, a law will not be upheld unless the government demonstrates that the law is necessary to further a compelling governmental interest and has been narrowly tailored to achieve that interest.").

Similarly—and also under the Fourteenth Amendment—government policies that are premised upon treating groups of people differently must be "rationally related to a legitimate state interest."[13] Thus, to prevail in a legal challenge to its Policy, GMU would have to demonstrate that it has a compelling state interest in treating employees with natural immunity differently from those who have been vaccinated, and that this Policy is the least restrictive means of achieving that end.[14]

GMU cannot show that it has a compelling interest in coercing Professor Zywicki into receiving a COVID-19 vaccine. Nor can GMU show a compelling interest in treating him differently from employees who have received the vaccine. Substantial research establishes that a COVID-19 infection creates immunity to the virus at least as robust and long lasting as that achieved through vaccination (*see* Ex. A at ¶¶ 16-17; Affidavit of Drs. Bhattacharya and Kulldorff, attached as Exhibit B at ¶¶ 15-23). For example, a recent study conducted by researchers at Cleveland Clinic of 1,359 unvaccinated individuals previously infected with COVID-19 found *zero* reinfections.[15] The researchers' conclusion that "individuals who have had SARS-CoV-2 infection are unlikely to benefit from COVID-19 vaccination[,]" echoes other studies determining that natural immunity is no less effective in combatting COVID-19 infection – whether from the original virus or any of the mutant variants – than immunity conferred through any of the three vaccines approved for use in the United States (*see* Ex. A at ¶¶ 12-34; Ex. B at ¶¶ 15-23, 28-32).

Nor is there any evidence or reason to believe that natural immunity provides less durable immunity than vaccination.[16] This is especially so in light of Professor Zywicki's recent antibodies screening test, which shows that he has ongoing and robust immune protection. In fact, growing recognition of the highly protective character of natural immunity has recently led the European Union to recognize "a record of previous infection" as a valid substitute for natural immunity (*see* Ex. A at ¶ 27). Likewise, the Commonwealth of Virginia's rule governing vaccination of school children for measles, mumps, rubella, and varicella (chickenpox) explicitly exempts from the requirements those who can demonstrate existing immunity through serological testing that measures protective

---

[13] *See, e.g., City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 432 (1985).
[14] *See id.*
[15] Nabin K. Shrestha, et al., *Necessity of COVID-19 Vaccination In Previously Infected Individuals*, MEDRXIV (June 5th, 2021), https://www.medrxiv.org/content/10.1101/2021.06.01.21258176v2.
[16] *Id. See also* Yair Goldberg, et al., *Protection of Previous SARS-Cov-2 Infection is Similar to That of BNT162b2 Vaccine Protection: A Three-Month Nationwide Experience From Israel*, MEDRXIV (April 20, 2021), https://www.medrxiv.org/content/10.1101/2021.04.20.21255670v1.full.pdf; Smerconish, *Should Covid Survivors and the Vaccinated be Treated the Same?*: Interview with Jay Bhattacharya, Professor of Medicine at Stanford University (CNN June 12, 2021), https://www.cnn.com/videos/tv/2021/06/12/should-covid-survivors-and-the-vaccinated-be-treated-the-same.cnn; Marty Makary, *The Power of Natural Immunity*, WALL STREET JOURNAL (June 8, 2021, 12:55 PM), https://www.wsj.com/articles/the-power-of-natural-immunity-11623171303 (last visited June 29, 2021).

antibodies.[17] To put it bluntly, natural immunity has long been recognized by the medical community and in public policy as a reason not to receive a vaccine, and certainly not to mandate one. Nothing is achieved in the way of promoting his own or the community's safety by requiring Professor Zywicki to undergo a COVID-19 vaccine procedure against his will.

To the contrary, Professor Zywicki's physician has advised him that, given his natural immunity, a COVID-19 vaccination is medically unnecessary. Thus, forcing him to receive the vaccine is itself a violation of the rules governing medical ethics because *any* medical procedure, including any vaccination, runs *some* risk of adverse effects (*see* Ex. A at ¶¶ 12-34; Ex. B at ¶¶ 25-27). The currently approved COVID-19 vaccines are no exception.

It is also critically important to understand that none of the currently approved vaccines has been tested in clinical trials for its safety and efficacy on individuals who have recovered from COVID-19. Indeed, *survivors of previous COVID-19 infections have specifically been excluded from the trials conducted so far.* Current evidence indicates that vaccination presents a *heightened* risk of adverse side effects— including serious ones—to those who have previously contracted and recovered from COVID-19 (*see* Ex. A at ¶¶ 22-26; Ex. B at ¶ 27). Confirming the opinion of Dr. Noorchashm, a recent research paper concluded that "we cannot exclude the possibility that the vaccination of a growing number of [individuals] with preexisting immunity to SARS-Cov-2 may trigger unexpectedly intense, albeit very rare, inflammatory and thrombotic reactions in previously immunized and predisposed individuals."[18] Dr. Noorchashm is particularly concerned due to Professor Zywicki's recent bout of shingles. As the doctor explains, "the causal virus, Herpes Zoster, resides in nerves and, in my opinion, can be reactivated by an unnecessary COVID-19 vaccination" (*see* Ex. A at ¶ 19).

GMU's Policy forces Professor Zywicki to choose between risking injury to his health on one hand and sustaining injury to his career on the other. By threatening adverse professional and personal consequences, GMU's Policy directly harms Professor Zywicki's autonomy and dignity. It also forces him to endure the stress and anxiety of choosing between his commitment to his health and to his teaching career. Given that his demonstrated natural immunity renders his vaccination status irrelevant with respect to his ability to safely teach students and perform his duties as a faculty colleague, GMU's irrational Policy constitutes no less a needless assault on Professor's Zywicki's privacy and dignity than requiring him to make daily disclosures of other private and potentially embarrassing medical conditions (*see* Ex. B at ¶¶ 35-44). For this reason, the Policy entails a clear and unequivocal violation

---

[17] 12 Va. Admin. Code § 5-110-80 (2021).
[18] Angeli et al., *SARS-CoV-2 Vaccines: Lights and Shadows*, 88 EUR. J. INTERNAL MED. 1, 8 (2021).

of Professor Zywicki's Ninth and Fourteenth Amendment Constitutional rights.

Masking and social distance requirements also unnecessarily restrict Professor Zywicki's First Amendment rights, specifically his freedom of expression, association and assembly.[19] Because, for the reasons discussed above, the classification between vaccinated faculty and those with natural immunity defies rationality, the University's discriminatory policy is unlawful. In fact, the irrationality of GMU's Policy is further exposed by its acceptance of the Johnson & Johnson/Janssen vaccine, which is shown to be only 66.3% effective in clinical trials[20], a level of immunological protection substantially lower than that conferred by natural immunity.[21]

In addition to violating Professor Zywicki's constitutional rights, the Policy conflicts with federal law. None of the three vaccines approved for use in the United States has received full Food and Drug Administration (FDA) approval. Rather, they have only been granted Emergency Use Authorization (EUA) status. The governing federal statute mandates that those being administered a medical product approved for use under it be informed of the option to accept <u>or refuse</u> its administration, and of alternatives.[22] GMU's coercive Policy flies in the face of the intent and the spirit of the EUA statute. It thus violates the Supremacy Clause of the United States Constitution, which dictates that a state or local law is preempted when is creates "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."[23] The federal policy to allow individuals to choose for themselves to refuse the COVID vaccines is for naught if GMU creates a contrary policy requiring such vaccines to be taken. In short, the federal and state policies cannot coexist.

Finally, tying the disclosure of medical records to merit-based pay raises—as GMU's Policy does—raises significant privacy concerns. The Virginia Department of Human Resource Management has advised state agencies that "asking for vaccination status is sensitive to many and can also lead to legal liabilities that agency leaders may not be prepared to address."[24] Additionally, the recent proliferation of data breaches raises substantial security concerns about the ability of organizations,

---

[19] See *Tinker*, 593 U.S. 503 (holding that a student's wearing of an armband was a type of symbolic act protected by the First Amendment's free speech clause).
[20] *Johnson & Johnson's Janssen COVID-19 Vaccine Overview and Safety*, CENTERS FOR DISEASE CONTROL AND PREVENTION (CDC), June 23, 2021, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/different-vaccines/janssen.html.
[21] MEDRXIV, *supra* note 9.
[22] *See* 21 U.S.C. § 360bbb-3(e)(1)(A).
[23] *Arizona v. United States*, 567 U.S. 387, 399-400 (2012); *see also* U.S. Const. art. VI, cl. 2.
[24] Guidance on Face Coverings and Vaccinations Resulting from CDC Update on May 13, 2021 and Executive Order 72, Virginia Department of Human Resource Management (May 15, 2021).

such as universities, to safely store sensitive medical records.[25] Virginia personal and medical data breach statutes, which impose significant penalties for statutory violations, may also raise liability issues with respect to the requirement that GMU faculty upload medical records to an online portal.[26]

It is true that forcing all employees (and students) to disclose confidential medical information into an online portal would ease the bureaucratic burden of surveilling the private health decisions of those who work and attend school at GMU. Indeed, the "online portal" could be used to monitor students, faculty, and staff to ensure that they are eating enough vegetables, exercising regularly, abstaining from alcohol, not staying up too late, and otherwise adopting health habits that will strengthen their immunity and thereby protect the GMU community from the risk of COVID-19 spread. But there is no "bureaucratic convenience" exception to the Constitution. Before a state actor can impose on or restrict an individual's privacy and autonomy, the state must demonstrate that its end is justified by a legitimate state interest and that the means it has chosen are the least-intrusive available to accomplish that end.

### IV. GMU RISKS LEGAL ACTION IF IT DOES NOT CHANGE ITS POLICY IMMEDIATELY

As noted by Drs. Bhattacharya and Kulldorff in their Declaration, universities hold a unique position of public trust in building respect for sound principles of science and ethics (*see* Ex. B at ¶¶ 35-44). Bhattacharya and Kulldorff also observe that "[i]t is unethical to coerce low-risk Americans to take the vaccine, such as students and those with natural immunity, while older high-risk individuals in Asia, Africa and Latin America are dying from COVID19 because there are not enough vaccines available in those countries" (Ex. B at ¶ 40). GMU has an opportunity to be a leader in developing a rational, scientifically-based, and humane policy that honors the judgment of Professor Zywicki and others who have natural immunity to be free from invidious discrimination though they choose not to subject themselves to medically unnecessary vaccinations that could benefit people who need them (*see* Ex. B at ¶¶ 35-44).

The motto of GMU is "Freedom and Learning."[27] This vision is backed by the "Mason idea," which is that "Mason at its core is innovative, diverse, entrepreneurial, and accessible." The motto of the law school, where Professor Zywicki has dedicated his professional career, is "Learn. Challenge. Lead." These values are exemplified by the life of George Mason himself, who refused to sign the

---

[25] Lance Whitney, *2020 Sees Huge Increase in Records Exposed in Data Breaches*, TECHREPUBLIC (Jan. 21, 2021, 10:50 AM), https://www.techrepublic.com/article/2020-sees-huge-increase-in-records-exposed-in-data-breaches/.
[26] Va. Code Ann. § 18.2-186.6; § 32.1-127.1:05.
[27] https://vision.gmu.edu/the-mason-vision/.

United States Constitution because it lacked a Bill of Rights to protect individual liberties, and of Justice Antonin Scalia, who through force of intellect, independent thinking, and commitment to the rule of law transformed American jurisprudence. GMU employees are told that the Mason idea "reminds us that we are committed to be a university *for* the world, drawn together to work across cultures, bring new perspectives and solutions to the world's most pressing problems and preparing our solutions to navigate in it."[28]

In sum, although the Policy may be well-intentioned, GMU has breached its constitutional and ethical obligations by interfering with health decisions that should reside with individuals and their medical providers. Given the lack of GMU's knowledge as to Professor Zywicki's specific health circumstances, the University is in no position to evaluate the risks and benefits associated with vaccinating the professor. As Professor Zywicki possesses natural immunity to the virus, GMU similarly lacks any interest—let alone a compelling one—in coercing him into receiving a COVID-19 vaccine or foisting burdens upon him that jeopardize his ability to perform his professional responsibilities. NCLA therefore urges GMU to re-examine its Policy, to deem natural immunity at least equivalent to that achieved through vaccination, and to confirm that Professor Zywicki will not lose eligibility for future pay raises (merit or otherwise) if he does not wish to share his vaccination status.  Please inform the undersigned of any decision to change GMU's policy as soon as possible, but certainly before July 28. Professor Zywicki would have to receive the vaccine as the Policy currently stands by August 1. Rest assured that NCLA is always prepared to file appropriate legal action to protect the rights of our clients and all Americans.

Sincerely,

**Jenin Younes**
Litigation Counsel
**Harriet Hageman**
Senior Litigation Counsel
**Mark Chenoweth**
General Counsel
New Civil Liberties Alliance

cc:
Mr. Ken Randall
Dean of Antonin Scalia Law School
George Mason University
krandall@gmu.edu

---

[28] *Id.*